**UNITED STATES ex rel. RAKICS v. UHL, Acting Commissioner of Immigration.**

(Circuit Court of Appeals, Second Circuit. May 12, 1920.)

No. 191.

1. **Habeas corpus ⬤⟾113(1)—Judgment reviewable by appeal.**
   In the federal courts when there has not been a jury trial, an order discharging or remanding a prisoner in habeas corpus proceedings is ordinarily reviewable by appeal, and not on writ of error.

2. **Aliens ⬤⟾54—Findings of fact on fair hearing in deportation proceedings conclusive.**
   An order for deportation of an alien under Act Oct. 16, 1918, § 1 (Comp. St. Ann. Supp. 1919, § 4289¼b[1]), on findings based on his own testimony, where he was given a fair hearing, cannot be reviewed on habeas corpus because he later denied some of the sentiments previously expressed; the findings of fact by the executive department being conclusive.

3. **Aliens ⬤⟾54—Procedure summary in deportation proceedings.**
   Act Oct. 16, 1918, § 2 (Comp. St. Ann. Supp. 1919, § 4289¼b[2]), in providing for deportation of aliens who are members of anarchist, and similar classes, contemplates a summary investigation, and not a judicial trial, and the formalities of procedure and rules which govern the admissibility of evidence in a judicial trial are not controlling in such proceedings.

Appeal from the District Court of the United States for the Southern District of New York.

Habeas corpus, on the relation of Daniel Rakics, against Byron H. Uhl, Acting Commissioner of Immigration at the Port of New York. From an order dismissing the writ, petitioner appeals. Affirmed.

Charles Recht, of New York City (Walter H. Pollak, Charles Recht, and Ruth I. Wilson, all of New York City, of counsel), for appellant.

Francis G. Caffey, U. S. Atty., of New York City (David V. Cahill, Asst. U. S. Atty., of New York City, of counsel), for respondent.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

ROGERS, Circuit Judge. This is a deportation proceeding. The relator was arrested on May 5, 1919, under a warrant issued by the United States Department of Labor. The warrant was issued pursuant to an application made by the inspector in charge of the Department of Labor at Cleveland, Ohio, based on statements made by the relator to a special agent of the Department of Justice, and on the minutes of a hearing accorded to him by the Department of Justice in March, 1919. On May 7, 1919, another hearing was accorded the re-

⬤⟾For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

lator at Cleveland by the inspector of the Immigration Service of the Department of Labor. The findings of the inspector are summarized as follows:

"This alien admits guilt on all of the charges mentioned in the warrant of arrest, with the exception that he denied that he believes in violence. He states that he believes in revolution, does not believe in the present form of government of the United States, does not believe in organized government, and does believe in sabotage. Besides being of the anarchistic class he is an ordinary thief. It is strongly recommended that he be deported."

The minutes of the hearing, together with the findings of the inspector, were submitted to the Acting Secretary of the Department of Labor and were approved by him; and on May 26, 1919, that official issued a warrant of deportation addressed to the Commissioner of Immigration at Ellis Island, New York Harbor. The warrant states that the Acting Secretary of Labor has become satisfied that the relator—

"has been found in the United States in violation of an act approved October 16, 1918, for the following, among other reasons, to wit: That he believes in the overthrow by force or violence of the government of the United States; that he advocates the overthrow by force or violence of the government of the United States; that he advocates the unlawful destruction of property and that he disbelieves in all organized government."

And it commanded the Commissioner of Immigration to return the relator to Hungary, the country from which he came. Thereupon the relator applied to one of the District Judges in the Southern district of New York, he having been brought within the district under the deportation warrant, for a writ of habeas corpus directing the Commissioner of Immigration to produce the relator before the court for a hearing and determination concerning his unlawful detention.

The petitioner was brought into the District Court on October 11, 1919. No evidence was taken in that court, but the case was disposed of on the petition, return, and traverse. The court below dismissed the writ of habeas corpus and remanded the petitioner to the custody of the Commissioner of Immigration.

[1] The relator has appealed from the decree entered in the District Court dismissing the petition for habeas corpus. At the early common law it has been said that no appeal or writ of error was allowed from a judgment in a habeas corpus proceeding remanding or discharging a prisoner. Hammond v. People, 32 Ill. 446, 83 Am. Dec. 286; State v. Galloway, 5 Cold. (Tenn.) 326, 98 Am. Dec. 404. And even at the present time a conflict of opinion exists in the state courts upon the question whether a judgment in habeas corpus is appealable, and a number of the courts hold that in the absence of a statutory provision no appeal lies. People v. McAnally, 221 Ill. 66, 77 N. E. 544, 5 Ann. Cas. 590; Ex parte Cox, 44 Fla. 537, 33 South. 509, 61 L. R. A. 734; Bleakley v. Smart, 74 Kan. 476, 87 Pac. 76, 11 Ann. Cas. 125. In those jurisdictions where a decision in a habeas corpus proceeding is reviewable, the law is not uniform whether the remedy is by appeal, or by writ of error, or by certiorari. In the federal courts, in cases where there has been no trial by jury, ordinarily the remedy is by appeal, and not by writ of error. Hecht v. Boughton, 105 U. S. 235,

26 L. Ed. 1018; United States v. Union Pacific Railroad Co., 105 U. S. 263, 26 L. Ed. 1021. The Act of Congress of August 29, 1842, c. 257, expressly provides for appeals in cases of habeas corpus, and no question is raised in the present case as to the right to proceed in that manner.

[2] The petitioner is a native of Hungary, and he has never declared his intention to become a citizen of the United States. He came to this country from Germany in 1907, and since 1917 he has been a member of the Industrial Workers of the World. The warrant of deportation is issued under the Act of October 16, 1918, 40 Stat. part 1, p. 1012, c. 186 (Comp. St. Ann. Supp. 1919, §§ 4289¼b[1]–4289¼b[3]). Section 1 of that act (section 4289¼b[1]) provides as follows:

"That aliens who are anarchists; aliens who believe in or advocate the overthrow by force or violence of the government of the United States or of all forms of law; aliens who disbelieve in or are opposed to all organized government; aliens who advocate or teach the assassination of public officials; aliens who advocate or teach the unlawful destruction of property; aliens who are members of or affiliated with any organization that entertains a belief in, teaches, or advocates the overthrow by force or violence of the government of the United States or of all forms of law, or that entertains or teaches disbelief in or opposition to all organized government, or that advocates the duty, necessity, or propriety of the unlawful assaulting or killing of any officer or officers, either of specific individuals or of officers generally, of the government of the United States or of any other organized government, because of his or their official character, or that advocates or teaches the unlawful destruction of property shall be excluded from admission into the United States."

The relator, in his examination before a special agent of the Department of Justice on March 23, 1919, testified that he is married and has one child; that he is a member of the I. W. W., and for a time was secretary of one of its locals. He was asked whether he knew what the principles of the organization are, and replied that he did not know them all. Asked what the organization was striving for, he answered:

"They are striving for better conditions—abolish the wage system."

Then followed:

"Q. How do they intend to bring about these results? A. Organize the working people.

"Q. Organize them for what? A. For better conditions.

"Q. After the working people are organized, what steps does the I. W. W. expect to take to bring about these better conditions? A. I do not know.

"Q. Has no one in the I. W. W. ever told you of plans they had for bringing that about? A. They may have—I have forgotten.

"Q. Are you satisfied with the form of government which we at present have in the United States? A. I am not.

"Q. What is your opposition to it? A. I cannot answer.

"Q. Would you like to see the government of the United States overthrown? A. Yes—without bloodshed.

"Q. Do you believe it would be right to use force to overthrow the government of the United States? A. No.

"Q. Are you opposed to organized form of government in general? A. No.

"Q. Do you believe in the assassination of public officials? A. No.

"Q. Would you believe in the assassination of the President of the United States or any other particular official individual? A. No; I do not believe in anything like that at all.

"Q. Why do you wear a red necktie? A. Because this is our style.

"Q. Does it have any particular significance? A. Signifies internationalism.

"Q. Is it not also the symbol of the anarchist? A. No.

"Q. Are you an anarchist? A. No.

"Q. Did you understand the questions put to you yesterday in the other room? A. I was excited, and did not know what I was saying.

"Q. Do you know that you told us yesterday that you believed in the overthrow of the government of the United States by force? A. Yes; I know I said that; but I was excited and did not know what I was saying.

"Q. Who has visited you in jail? A. No one.

"Q. Has any one told you to deny what you told us yesterday? A. No.

"Q. Do you mean to tell me that yesterday you believed in the overthrow by force of the government of the United States, and that to-day you do not believe in it—that you have changed your mind? A. I said that yesterday because I was very mad.

"Q. You believed it yesterday, but to-day you do not? A. I was mad · that is why I said it.

"Q. Have you any property or any money in the bank? A. No."

On May 7, 1919, he was examined before the immigration inspector and testified in part as follows:

"Q. Did you belong to the radicals in Hungary before you came here? A. No.

"Q. When did you become a radical? A. Since the war started.

"Q. What made you a radical? A. When they sent the poor people to the butcher shop; that made me a radical.

"Q. What do you mean by sending the poor people to the butcher shop? A. Because the people could leave this war out and live like one family.

"Q. If the officers of the government, which are chosen by the people, as it is done in the United States, determine that it is for the interest of the country to go to war, don't you think it is the duty of the citizens and residents to back up the government in every shape and manner? A. Let those who declared war go and finish it, and not call on any one else. * * *

"Q. What are the principles of the I. W. W.? A. As I understand them, the principles are to educate the people and make free the working people.

"Q. Don't you consider the working people of this country free at the present time? A. No.

"Q. In what way are they not free? A. They work 10 and 12 hours a day, like a mule, without having a decent living.

"Q. Does this organization to which you belong advocate anarchy? A. Yes.

"Q. Do they advocate sabotage? A. Yes.

"Q. Do you believe in all of the principles of the I. W. W.? A. Yes; it does not teach you anything bad.

"Q. Now, I have shown to you and read to you a report by the special agent of the Department of Justice in reference to what you stated to him on March 23, 1919. I want to ask you if this agent reported the truth as to what he was told by you? A. I do not know.

"Q. Then I will call your particular attention to several of the points mentioned in this report. Did you state to this agent that the reason that you never declared your intentions to become a citizen of the United States was because you did not believe in the form of government here? A. Yes.

"Q. Did you further state that you did not believe in any form of government, only the soviet form of government, like that in Russia? A. Yes.

"Q. Did you tell this officer that you believe in sabotage and direct action? A. Yes.

"Q. Did you tell him that you believe that the form of government of the United States was wrong, and would like to see it changed? A. Yes.

"Q. Did you tell him that you thought it would be all right to start a revo-

lution to overthrow the present government of the United States? A. I did not tell him that way. He asked me if I wanted to see a revolution in this country, and I told him 'Yes.'

"Q. You were secretary of Local No. 606 of the I. W. W. for three months or more? A. Yes.

"Q. Were these things that you expressed to the Department of Justice agent your own convictions? A. Yes; I told him just what I thought.

"Q. Then, if this is so, the first allegations contained in the warrant of arrest, that you believe in the overthrow by force or violence of the government of the United States, is true? A. I never said I believed in using force.

"Q. But you do believe in the overthrow of the present form of government of the United States? A. Yes.

"Q. And the further allegation that you advocate the overthrow by force or violence of the government of the United States—do you believe that is true? A. Yes; that is all I know about sabotage.

"Q. What do you understand sabotage to be? A. I mean, if I ask for anything, and cannot get it in the right way, cannot get it peacefully, get it by strike, then return back. If I cannot get it by strike, go on back to work; but we do not work like we used to; we work slow; lay around; do not believe in destroying anything.

"Q. Another allegation contained in this warrant says that you disbelieve in all organized government. Is that so? A. Yes.

"Q. I note in this report, which I have shown and read to you, that you were arrested some time in March by a representative of the Bailey Company for shop-lifting. The agent states that you had some red neckties in your possession which were stolen from the counters of the Bailey Company store. Is this story true? A. Yes.

"Q. Were you fined? A. No; they let me go. * * *

"Q. As I told you in the beginning, the purpose of this hearing is to give you an opportunity to show cause why you should not be deported to the country of which you are a citizen on the grounds mentioned in the warrant of arrest. As you have waived your right to an attorney, I would like for you to give full reasons why you should not be deported. You can make as complete a statement as you please. A. I want to be deported. I do not want to be here, hanging around and knocking around from one place to another. If they do not want to deport me, give me a chance to get out; do not let my wife and child suffer."

Prior to his examination he was notified that he had the right to employ an attorney, and replied that he had no money to employ an attorney, and did not care for a lawyer. At the close of the examination he was asked whether he had been treated kindly, and replied: "Yes, sir."

The relator is in this court objecting that there is no proof that he believed in the overthrow by force or violence of the government of the United States, or that he advocates the unlawful destruction of property. The relator in his petition for the writ states:

"Relator was further asked whether he believes in the unlawful destruction of property, and stated that he does not; the record in this case, as relator is informed and verily believes, shows that relator's answer was in the affirmative. Relator states that he was asked whether he believes in sabotage, to which he answered that he believes in certain forms of lawful sabotage; but, as relator is informed, the record does not contain his answer, but simply states 'Yes' in answer to the said question. Relator was further asked if he believes in 'free love,' to which he answered that the questioner does not know what that means; instead of recording the answer as it was given, the record shows, as relator is informed, that the relator answered 'Yes.' Relator further states that the interpreter furnished did not correctly understand the language, and did not interpret his answers faithfully. Relator was, by reason of the facts herein set forth, not accorded a fair hearing, and

the warrant of deportation was unlawfully issued, not having been based upon a true and correct record of the proceedings actually had in the case."

In his traverse to the return the relator denies categorically that he ever said what the stenographic record made at the hearing declares he did say. But the fact of the relator's contradictions and his explanation of them were before the Acting Secretary of Labor at the time the warrant for deportation was signed. Moreover, the affidavit of the immigration inspector is in the record, and it states that the copy of the minutes of the hearing before the inspector is "a true copy." There is, too, a presumption that the official stenographer's minutes are correct. The allegations of the traverse were put in issue without a reply. In re Leary, Fed. Cas. No. 8,162. As they were thus controverted, the burden of proving them was on the petitioner, and no evidence to sustain them was offered.

The statutes provide:

"Sec. 760. The petitioner of the party imprisoned or restrained may deny any of the facts set forth in the return, or may allege any other facts that may be material in the case. Said denials or allegations shall be under oath. The return and all suggestions made against it may be amended, by leave of the court, or justice, or judge, before or after the same are filed, so that thereby the material facts may be ascertained.

"Sec. 761. The court, or justice, or judge shall proceed in a summary way to determine the facts of the case, by hearing the testimony and arguments, and thereupon to dispose of the party as law and justice require."

Revised Stat. of U. S. (2d Ed.) 1878, p. 143 (Comp. St. §§ 1288, 1289).

The relator made no demand for the summary hearing authorized by section 761, and he offered no proof to sustain the allegations of the traverse. In his traverse to the return, relator sets forth the following question and answer with his denial:

"Did you understand the questions that I have asked you, and have you been treated kindly? A. Yes, sir."

As a matter of fact relator replied:

"I did not understand all, but most, of the questions. You have treated me kindly, but agents of the Department of Justice and the persons in charge of the jail have constantly abused me, threatening that they would hang me and beat me, and used all kinds of abusive and vile language to me."

But the return before the Secretary of Labor disclosed the fact that the relator claimed that he had been abused, and that the abuse had made him mad, and that certain of his answers had been given erroneously because of his anger. His allegation has not been sustained by any testimony. This court has no doubt that there was evidence before the Department of Labor from which the Secretary of Labor might legally find that the relator believes in the overthrow of the government of the United States by force, and that he advocates the unlawful destruction of property. There was before the Department a telegram sent by a special agent of the Department of Justice which reads as follows:

"Daniel Rakies, Hungarian alien enemy, detained, admits he is anarchist, believes in sabotage; prominent member and official in Keeve Unman Unman. Full report being made."

It appears, too, that the relator stated that he believes in the soviet form of government, like that of Russia, and that he believes in sabotage and direct action, and that he believes it would be all right to start an armed revolution to overthrow the present government of the United States.

[3] The act under which this proceeding was instituted contemplates a summary investigation, and not a judicial trial. The formalities of procedure and the rules which govern the admissibility of evidence in a judicial trial are not controlling in such proceedings. A series of decisions in the Supreme Court has settled it that hearings, like the one in question here, and tried before executive officers, are conclusive when fairly conducted. To successfully attack them before the courts, it must appear that the proceedings were manifestly unfair, that the executive officers acted in such manner as prevented a fair investigation, or it must be shown that there was a manifest abuse of discretion. In other cases the order of the executive officer within the authority of the statute is final. Low Wah Suey v. Backus, 225 U. S. 460, 468, 32 Sup. Ct. 734, 56 L. Ed. 1165.

It does not appear that the hearings of which the relator complains were "manifestly unfair," or that "a fair investigation" has been prevented, or that there has been any "manifest abuse" of discretion. On the contrary, out of his own mouth the relator has condemned himself, and is now seeking to escape therefrom by asking this court to decide that the Commissioner of Labor was bound to believe the relator when on his second examination he said that he would like to see the government of the United States overthrown without bloodshed, and that he did not believe that it would be right to overthrow it by force, but was bound to disbelieve him when on his first examination he said the exact contrary. This court has no such right. It is enough for this court that the Commissioner of Labor had before him evidence which, if he believed it, justified the action which he decided to take. The objection seems to be that upon the evidence the Commissioner of Labor should have come to a different conclusion. Such an objection was one which could not be entertained in the court below or in this court. We have nothing to do with the weight of the evidence. Sibray v. United States, 227 Fed. 1, 7, 8, 141 C. C. A. 555.

We shall not review in detail the various assignments of error. They are in our opinion without merit. The relator was given a fair hearing, and the proceedings for his deportation are in accordance with the laws, rules, and regulations governing the subject.

Order affirmed.